**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOAN MORRISON,

                                        Plaintiff,

              - v -                                      Civ. No. 1:01-CV-636
                                                                  (RFT)
JOHN JOHNSON; DONALD SMITH; EDWARD
BARTLEY; KEVIN MAHAR; DAVID PETERS;
THERESA PALUMBO; LORI LEHNER; DANIEL
HULIHAN; and JOHN and JANE DOE,

                                        Defendants.


**APPEARANCES:**                                **OF COUNSEL:**

CARTER, CONBOY LAW FIRM                          JAMES A. RESILA, ESQ.
Attorney for Plaintiff
20 Corporate Woods Boulevard
Albany, NY 12211

HON. ELIOT SPITZER                               STEPHEN M. KERWIN, ESQ.
Attorney General for the State of New York       Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

<u>**MEMORANDUM-DECISION and ORDER**</u>

        Plaintiff Joan Morrison brings a civil action pursuant to 42 U.S.C. § 1983, alleging retaliation

in violation of her First Amendment right to free speech when she apparently attempted to "address a

matter of public concern by reporting what she viewed to be corrupt and fraudulent behavior within the

New York State Central Register of Child Abuse and Maltreatment." Dkt. No. 28, Second Am. Compl.

at ¶¶ 25-28.  Defendants bring a second Motion for Summary Judgment. Dkt. No. 105. Plaintiff

opposes the Motion. Dkt. Nos. 109-11. For the reasons that follow, Defendants' Motion for Summary

Judgment is **Denied** in part and **Granted** in part.

## I. PROCEDURAL HISTORY

Since the procedural history of this case is relevant, the Court will provide a brief recitation of the events that have occurred.  Previously, the Honorable Lawrence E. Kahn, United States District Judge, granted in part and denied in part Defendants' Motion for Summary Judgment. Dkt. Nos. 50-62, Mot. for Summ. J. & 71, Mem. Decision and Order, dated Mar. 2, 2004.  Summary Judgment was granted to all the named Defendants dismissing Plaintiff's First Amendment retaliation claim and the claim Under Article 1, Sections 8 and 9 of the New York State Constitution, the Fourteenth Amendment Equal Protection claims and claims under Article 1, Section 11 of the New York State Constitution as to Defendants Johnson, Smith, Bartley, Mahar, Lehner, Hulihan, and John and Jane Doe, and the Fourteenth Amendment and New York State Equal Protection claims as to Defendants Peters and Palumbo except for the claims denying Plaintiff equal protection by passing her over for promotions and conspiring to pass her over for promotion.  Mem. Decision and Order, dated Mar. 2, 2004.[1]  On February 15, 2005, a Stipulation of Discontinuance was filed by the Parties and Plaintiff discontinued with prejudice the claims, which were not dismissed by the District Court in its Memorandum-Decision and Order, dated March 2, 2004, specifically the Equal Protection claims under the Fourteenth Amendment and Article 1, Section 11 of the New York State Constitution, as well as the claim for conspiracy to deny Plaintiff equal protection against Peters and Palumbo. Dkt. No. 94, Stipulation, dated Feb. 15, 2005.  Plaintiff retained her right to appeal the Memorandum-Decision and Order. *Id.*

On March 14, 2005, Plaintiff appealed the Memorandum-Decision and Order to the Second

---

[1] On September 28, 2004, pursuant to 28 U.S.C. § 636(c), FED. R. CIV. P. 73, and N.D.N.Y.L.R. 72.2(b), the parties consented to, and the District Court referred for disposition of this matter by the undersigned.  Dkt. No. 80.

Circuit Court of Appeals.  Dkt. No. 96, Notice of Appeal, dated Mar. 14, 2005.  The Second Circuit issued its decision, affirming in part and vacating in part the Judgment of the District Court.[2]  Dkt. No. 101, Mandate.  The Second Circuit held that the statement of law as to the First Amendment analyzed by the District Court was incorrect and that other grounds asserted by Defendants on this cause of action had not been "well developed."  *Id.* at p. 162.  The Second Circuit, therefore, vacated the judgment, dismissing the First Amendment retaliation claim and remanded the matter for further proceedings.  *Id.*  In addition, the Second Circuit found that although Plaintiff appealed all aspects of the final judgment, the appeal contained no argument that the District Court had incorrectly dismissed the Equal Protection claims.  *Id.*  Thus, the Court stated that any challenge to the Equal Protection claims were abandoned.  *Id.*  The judgment was affirmed in all other respects.  *Id.*

Once the Mandate was issued, this Court asked for a status report from the Parties and held a brief conference on January 12, 2006, regarding the outstanding issues.  Text Order, dated Dec. 30, 2005, Dkt. Nos. 102, James Resila, Esq., Lt., dated Jan. 5, 2006, & 103, Stephen Kerwin, Esq., Lt., dated Jan. 6, 2006, and Minute Entry, dated Jan. 12, 2006.  On February 24, 2006, Defendants filed the current Motion for Summary Judgment as to Plaintiff's First Amendment retaliation claims.  Dkt. No. 105.

---

[2] A mandate was issued on December 2, 2005, but filed with the Court on December 28, 2005.  Dkt. No. 101, Mandate.

## II. FACTS[3]

Plaintiff is an employee of the New York State Office of Children and Family Services ("OCFS").  Dkt. No. 105, Defs.' 7.1 Statement at ¶ 1; Dkt. No. 110, Pl.'s 7.1 Statement at ¶ 1. Morrison has worked as a Child Protective Specialist I ("CPS") at the State Central Register of Child Abuse and Maltreatment ("SCR") since 1996. Defs.' 7.1 Statement at ¶¶ 2 & 3; Pl.'s 7.1 Statement at ¶¶ 2 & 3.  For those who are hired as CPS Is, classroom training is provided along with detailed procedures manuals, which are retained by the employees. Defs.' 7.1 Statement at ¶¶ 4, 5, & 6; Pl.'s 7.1 Statement at ¶¶ 4, 5, & 6.  Plaintiff received some training and a manual.[4]  Defs.' 7.1 Statement at ¶ 7; Pl.'s 7.1 Statement at ¶ 7.

At some point, Plaintiff became concerned with corruption and fraud within SCR, namely abuse of overtime, intentional mishandling of calls to the SCR hotline, and office gambling.  Defs.' 7.1 Statement at ¶¶ 9 & 10; Pl.'s 7.1 Statement at ¶¶ 9 & 10.  These concerns were relayed to Emmanuel Ned of the State Inspector General's Office in 1998.  Defs.' 7.1 Statement at ¶ 11; Pl.'s 7.1 Statement at ¶ 11.  In November 1999, Plaintiff addressed her concerns regarding the activities at SCR with the

---

[3] Pursuant to Northern District of New York Local Rule 7.1(a)(3), the party opposing the Motion for Summary Judgment must file a response to the movant's Statement of Material Facts.  The non-movant must mirror the movant's Statement of Material Facts by admitting and/or denying the assertions in each numbered paragraph, and the denials should provide a specific citation to the record where a factual issue arises.  N.D.N.Y.L.R. 7.1(a)(3).  The non-movant may also add additional material facts that he/she contends are in dispute in separate paragraphs.  *Id.*  However, any facts not specifically controverted by the non-movant may be deemed admitted.  *Id.*  Defendants assert Plaintiff has failed to comply with Local Rule 7.1(a)(3) and, therefore, judgment should be granted to Defendants.  Dkt. No. 114, Defs.' Reply. First , Defendants' Statement of Material Facts contains one hundred twenty-seven (127) paragraphs whereas Plaintiff's response to the Statement of Material Facts contains one hundred twenty-six (126) paragraphs.  *Compare* Dkt. No. 105, Defs.' 7.1 Statement *with* Dkt. No. 110, Pl.'s 7.1 Statement.  Furthermore, Plaintiff interjects objections as to several of the paragraphs and fails to provide citation to the record when there is a denial.  Dkt. No. 110.  However, the Court does not feel it is appropriate to grant judgment based upon Plaintiff's failure to comply with the Local Rule.  As such, the Court will proceed to decide the Motion utilizing Plaintiff's Statement of Material Facts with accompanying Exhibits, as well as Defendants' Statement of Material Facts with accompanying Exhibits to adduce the facts of the case.  Furthermore, where Plaintiff lodges a general objection that a statement is not fact but is instead testimony, the Court will limit the facts to those which are objective and can be corroborated by citation to a record.  *See* Part III.A.1.

[4] It is disputed as to when Plaintiff received the training.  Pl.'s 7.1 Statement at ¶ 7.

New York State Welfare Inspector General ("WIG"), specifically Sean Courtney. Defs.' 7.1 Statement at ¶¶ 12 & 124; Pl.'s 7.1 Statement at ¶¶ 12 & 124. In 1999, Plaintiff also met with Mr. Kirwin and Mr. Calhoun of the New York State Assembly, who in turn arranged for her to meet with a member of the Governor's staff. Defs.' 7.1 Statement at ¶ 13; Pl.'s 7.1 Statement at ¶ 13. Plaintiff had two face-to-face meetings with Courtney and spoke to him on the telephone several times. Defs.' 7.1 Statement at ¶ 14; Pl.'s 7.1 Statement at ¶ 14. Neither Courtney nor Kirwin disclosed that Plaintiff was their source of information as to either SCR or OCFS nor did anyone at SCR tell her they knew she was meeting with Kirwin, Calhoun, Courtney, or Acenowr, another representative from the State Inspector General's Office. Defs.' 7.1 Statement at ¶¶ 15 & 16; Pl.'s 7.1 Statement at ¶¶ 15 & 16. Furthermore, Defendants did not relay to Plaintiff that they knew of any meetings she had with outside agencies nor did Plaintiff have any knowledge as to whether any of the Defendants were aware of her conversations with these individuals. Defs.' 7.1 Statement at ¶¶ 17, 18, 126, & 127; Pl.'s 7.1 Statement at ¶¶ 17, 18, & 126.

Plaintiff not only spoke to outside agencies, but she further expressed her concerns about fraud and corruption at SCR with Carl Strock, a reporter for the Schenectady Daily Gazette, prior to the publication of an article in August 1999 regarding SCR. Defs.' 7.1 Statement at ¶¶ 20 & 123; Pl.'s 7.1 Statement at ¶¶ 20 & 123; Dkt. No. 62, Dep. Ex. 3, Article. A former co-worker, Donna Gonzalez, also spoke to Strock about an alleged overtime scam at SCR. Defs.' 7.1 Statement at ¶ 21; Pl.'s 7.1 Statement at ¶ 21. After the article was published on August 5, 1999, supervisory personnel at SCR, namely Defendant Peters, conducted a meeting to discuss the article. Defs.' 7.1 Statement at ¶¶ 22 & 23; Pl.'s 7.1 Statement at ¶¶ 22 & 23. There was speculation that Plaintiff was the source of Strock's information, but when Peters conveyed this conjecture to Defendant Smith, OCFS Deputy Commissioner in charge of SCR, it was dismissed as pure speculation. Defs.' 7.1 Statement at ¶¶ 24

& 25; Pl.'s 7.1 Statement at ¶¶ 24 & 25.  Plaintiff filed grievances against her supervisors, which included Defendant Palumbo.  Defs.' 7.1 Statement at ¶ 26; Pl.'s 7.1 Statement at ¶ 26.

On December 24, 1998, Plaintiff "took a law enforcement referral" ("LER") for an incident involving her son and a substitute teacher.  Defs.' 7.1 Statement at ¶ 27; Pl.'s 7.1 Statement at ¶ 27. This LER was completed on a SCR form by Plaintiff during working hours and was telefaxed to the State Police.  Defs.' 7.1 Statement at ¶ 28; Pl.'s 7.1 Statement at ¶ 28.  Plaintiff did not consult any of her colleagues or supervisors before sending the LER.[5]  Defs.' 7.1 Statement at ¶ 29; Pl.'s 7.1 Statement at ¶ 29.  The State Police received the LER which was forwarded to the Rensselaer County Sheriff and then to the Nassau Town Police.  Defs.' 7.1 Statement at ¶ 30; Pl.'s 7.1 Statement at ¶ 30.  The substitute teacher was charged with a crime, though the charges were eventually dismissed in the Nassau Town Court.  Defs.' 7.1 Statement at ¶ 31; Pl.'s 7.1 Statement at ¶ 31.  In February 1999, Plaintiff told her supervisor, Defendant Lehner, a CPS II, that she filed the LER against the teacher for the incident involving her son.  Defs.' 7.1 Statement at ¶ 32; Pl.'s 7.1 Statement at ¶ 32.  After this self-reporting, the matter was purportedly reported to Lehner's supervisor, Richard Piche, a CPS III, who did not act on the information.  Defs.' 7.1 Statement at ¶¶ 33 & 34; Pl.'s 7.1 Statement at ¶ 34.

Defendant Lehner was Plaintiff's supervisor from January 7, 1999 until July 21, 1999.  Defs.' 7.1 Statement at ¶ 35; Pl.'s 7.1 Statement at ¶ 35.  The beginning of their relationship was cordial but then deteriorated.  Defs.' 7.1 Statement at ¶ 36; Pl.'s 7.1 Statement at ¶ 36.  In July 1999, Defendant Lehner had a counseling session with Plaintiff over the use of her sick leave and subsequently, Lehner received an email from Plaintiff stating that Plaintiff would not tolerate harassment from Lehner.  Defs.' 7.1 Statement at ¶ 38; Pl.'s 7.1 Statement at ¶ 38.  In October 1999, purportedly concerned over fear

_____

[5] Plaintiff claims that no consult is needed or required.  Pl.'s 7.1 Statement at ¶ 29.

of retribution by Plaintiff, Lehner met with OCFS' Labor Relations Office, namely Walter Greenberg and William Robinson. Defs.' 7.1 Statement at ¶¶ 39 & 40; Pl.'s 7.1 Statement at ¶¶ 39 & 40.[6] During the course of her conversation with Greenberg, Lehner disclosed the incident regarding the LER filed by Plaintiff. Defs.' 7.1 Statement at ¶ 41. Apparently Greenberg and Robinson conveyed Lehner's information to Defendant Smith who in turn told his supervisor, Defendant Bartley, the Executive Deputy Commissioner. Defs.' 7.1 Statement at ¶¶ 43 & 45.

Defendant Bartley then assigned Defendant Mahar, Director of OCFS' Special Investigation Unit, to investigate the incident. Defs.' 7.1 Statement at ¶ 47; Pl.'s 7.1 Statement at ¶ 47. Defendant Mahar interviewed some individuals and in December 1999, met with Defendant Smith, Denise Matrazzo, Defendant Smith's assistant, Walter Greenberg, and William Robinson. Defs.' 7.1 Statement at ¶¶ 48 & 49; Pl.'s 7.1 Statement at ¶¶ 48 & 49. It was decided that disciplinary action should be taken against Plaintiff and Defendant Smith signed the Notice of Discipline. Defs.' 7.1 Statement at ¶¶ 50, 52, 53, 56 & 57; Pl.'s 7.1 Statement at ¶¶ 50, 52, 53, 56 & 57.[7] The Notice of Discipline charged Plaintiff with seven counts of misconduct, four which related to the filing of the LER and three relating to Plaintiff's lack of candor during Mahar's interrogation of Plaintiff on December 15, 1999. Defs.' 7.1 Statement at ¶ 76; Pl.'s 7.1 Statement at ¶ 76; Dep. Ex. 4, Notice of Discipline. The Notice sought Plaintiff's termination from employment. Defs.' 7.1 Statement at ¶ 77; Pl.'s 7.1 Statement at ¶ 77; Dep. Ex. 4, Notice of Discipline. The Notice was then served on Plaintiff by two SCR employees on December 23, 1999, one day prior to the expiration of the one-year limit provided for in the collective

---

[6] Plaintiff disagrees with the purpose of Lehner's meeting. Pl.'s 7.1 Statement at ¶¶ 39 & 40.

[7] It is disputed who decided to discipline Plaintiff, who attributed the decision to serve the notice to Smith, and the motivation behind the decision to serve the notice. Pl.'s 7.1 Statement at ¶¶ 50-54.

bargaining agreement.  Defs.' 7.1 Statement at ¶¶ 55 & 62; Pl.'s 7.1 Statement at ¶¶ 55 & 62.  Despite a request from the Governor's office that the Notice be retracted, Defendant Smith did not withdraw the Notice.  Defs.' 7.1 Statement at ¶ 58; Pl.'s 7.1 Statement at ¶ 58.  Plaintiff is unsure of Defendant Bartley's role regarding the Notice and only assumes Defendant Johnson, as Commissioner, knew about it because of his position.  Defs.' 7.1 Statement at ¶ 60; Pl.'s 7.1 Statement at ¶ 60.

During the pendency of the Notice, Plaintiff was placed on unpaid leave.  However, on the same day that the Notice was served, Plaintiff was placed on administrative leave with pay.  Defs.' 7.1 Statement at ¶ 78; Pl.'s 7.1 Statement at ¶ 78; Dep. Ex. 10, Smith Lt. Re: Suspension, dated Dec. 23, 1999.  Pursuant to the collective bargaining agreement, Plaintiff received a hearing before an arbitrator regarding the matter on March 22, April 18, May 19, June 26, and July 17, 2000.  Defs.' 7.1 Statement at ¶ 82; Pl.'s 7.1 Statement at ¶ 82; Dep. Ex. 12, Arbitrator Form.  On November 15, 2000, the arbitrator ruled that dismissal was not justified and following the arbitrator's decision, Plaintiff returned to her position as a CPS I in January 2001 with restoration of all accrued benefits.  Defs.' 7.1 Statement at ¶¶ 83 & 84; Pl.'s 7.1 Statement at ¶¶ 83 & 84.  Once Plaintiff returned to work in January 2001, she also received all her back pay and accrued annual leave.  Defs.' 7.1 Statement at ¶ 85; Pl.'s 7.1 Statement at ¶ 85.

According to the Plaintiff, she was given "retaliatory" counseling memoranda in response to grievances she had filed against her supervisors and that Defendants Peters, Palumbo, Lehner, and Hulihan conspired to serve her with the memoranda.  Defs.' 7.1 Statement at ¶¶ 87 & 89; Pl.'s 7.1 Statement at ¶¶ 87 & 89.  Plaintiff states that within a week of publication of Strock's article, Plaintiff received a counseling memorandum by Defendant Hulihan in regards to Plaintiff's use of sick leave and was made to justify all unscheduled leave with a doctor's note.  Defs.' 7.1 Statement at ¶ 90; Pl.'s 7.1

Statement at ¶ 90.  Plaintiff received another counseling memorandum when she arrived late to work

on her son's first day of school after having called to report her tardiness.  Defs.' 7.1 Statement at ¶ 91;

Pl.'s 7.1 Statement at ¶ 91.  An additional counseling memorandum was given to Plaintiff by Hulihan's

supervisor regarding interactions with Hulihan.  Defs.' 7.1 Statement at ¶ 92; Pl.'s 7.1 Statement at ¶

92.  In July 1999, Plaintiff was counseled by Defendant Lehner about her use of sick leave and then on

July 21, 1999, Plaintiff was removed from Lehner's supervision.  Defs.' 7.1 Statement at ¶¶ 93 & 95;

Pl.'s 7.1 Statement at ¶¶ 93 & 95.  Prior to this removal, Plaintiff also called in sick twice after being

denied time off.  Defs.' 7.1 Statement at ¶ 94; Pl.'s 7.1 Statement at ¶ 94.

Plaintiff further alleges that after the Notice of Discipline was served, she was passed over for

promotion.  Defs.' 7.1 Statement at ¶ 96; Pl.'s 7.1 Statement at ¶ 96.  Plaintiff learned that a co-worker,

Testo, was provisionally promoted over her to a CPS II position, though she believed she was more

qualified due to her age, as well as the fact that she has a master's degree and is experienced in

counseling.  Defs.' 7.1 Statement at ¶ 97; Pl.'s 7.1 Statement at ¶ 97.  However, Plaintiff does

acknowledge that both started work at the OCFS on the same date and that she did not know Testo's

level of education.  Defs.' 7.1 Statement at ¶ 98; Pl.'s 7.1 Statement at ¶ 98.

Child Protective Specialist positions are competitive class employment and a permanent

promotion is received through an appointment from an eligibility list, which follows a competitive

examination.  Defs.' 7.1 Statement at ¶¶ 99 & 100; Pl.'s 7.1 Statement at ¶¶ 99 & 100.  Promotions for

the CPS II position were made from a list compiled of applicants who took a promotion examination

in 1996.[8]  Defs.' 7.1 Statement at ¶ 101; Pl.'s 7.1 Statement at ¶ 101.  The list became non-viable in

---

[8] Defendants state Plaintiff's name was not on the list.  Plaintiff states she does not have the knowledge or information to know that her name was not on the list.  Defs.' 7.1 Statement at ¶ 102; Pl.'s 7.1 Statement at ¶ 102.

2000, as there were fewer than three (3) names on the list, and expired in 2001.[9]  Defs.' 7.1 Statement at ¶ 103.  A new promotion list was issued by the Department of Civil Service in 2002.  *Id.* at ¶ 104.[10]  During the time period where the list became non-viable until a new list was issued (2000-2002), OCFS made fourteen provisional appointments to CPS II positions.  *Id.* at ¶ 106.

A provisional appointment is one that can become permanent if the appointee successfully takes the promotion examination so that he or she is among the three highest-ranked candidates willing to accept the position, which is referred to as "reachable."  *Id.* at ¶ 108.  If the appointee is not "reachable" on the promotion list, then he or she is returned to his or her prior position and someone who is "reachable" can be appointed to the position.  *Id.* at ¶ 109.  OCFS' practice was to make provisional appointments from those responding to an Employment Opportunity Announcement, which was posted by the OCFS.  *Id.* at ¶¶ 111 & 112.  Testo received a provisional appointment in March 2001.  *Id.* at ¶ 113.  In 2001, Plaintiff responded to an Announcement for three CPS II positions and was considered for another single provisional appointment in 2002.  *Id.* at ¶ 114.[11]

In order to determine who is chosen for the provisional appointment, the candidates would be interviewed by a panel of CPS IIIs.  *Id.* at ¶ 115.  The panel would then make a recommendation to Defendant Palumbo who would in turn pass on the name of the recommended candidate to Defendant Peters for final approval.  Peters evidently approved the recommendations made by the committee.  *Id.* at ¶¶ 116, 117 & 118.  Plaintiff, however, was not presented to Defendant Palumbo as a candidate for

---

[9] Plaintiff disagrees only because the "assertion is unknown to plaintiff."  Pl.'s 7.1 Statement at ¶ 103.

[10] Plaintiff again states that she disagrees with this proposition because she did not receive notice of the list.  Pl.'s 7.1 Statement at ¶ 104.  Plaintiff further disagrees that her name was not on the list because she "did not receive notice of her opportunity."  Defs.' 7.1 Statement at ¶ 105; Pl.'s 7.1 Statement at ¶ 105.

[11] Plaintiff disagrees with paragraphs 106-114 of Defendants' Statements of Material Facts by stating the "assertion is unknown to plaintiff."  Pl.'s 7.1 Statement at ¶¶ 106-14.

promotion on the four occasions that she applied for a provisional appointment. *Id.* at ¶ 119. Even if Plaintiff had received the promotion, as her name did not appear on the new CPS II promotion list, she would have been returned to her CPS I position in 2002. *Id.* at ¶ 120.[12]

### III. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings,*

---

[12] Plaintiff merely disagrees with paragraphs 115-120 by stating "defendants Palumbo and Peters would never promote plaintiff." Pl.'s 7.1 Statement at ¶¶ 115-20.

*Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact.  *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Stated another way,

> [t]he function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment.

*Gorman-Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 558 (2d Cir. 2001) (quoting *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 622 (2d Cir.1999).

### 1.  Compliance with Local Rule 7.1(a)(3)

Defendants contend that Plaintiff has failed to properly respond to Defendants' Statement of Undisputed Material Facts and therefore judgment should be granted in their favor.  Dkt. No. 114, Defs.' Reply Mem. of Law at pp. 2-9; *see also supra* n.3.

Northern District of New York Local Rule 7.1(a)(3) states:

> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. <u>Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.</u>

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. <u>Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.</u>

Local Rule 7.1(a)(3) "places the onus on the parties to marshal the evidence that either supports, or defeats, the motion." *Fusco v. City of Rensselaer*, 2006 WL 752794, at *2 (N.D.N.Y. Mar. 22, 2006) (citing *Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 291 (2d Cir. 2000) for the proposition that "[t]he Court's Local Rules require the parties 'to clarify the elements of the substantive law which remain at issue because they turn on contested facts' and the Court 'is not required to consider what the parties fail to point out.'") (further citation omitted).

"Our District Requirements are not mere formalities[13] . . . . When a party fails to comply with

---

[13] It appears that all of the Judges in this District have spoken on this very issue. *See infra* n.14. The Honorable Thomas J. McAvoy, now Senior District Judge, summarized the sentiment of this Court in dicta by opining that it is

> regretful [to] address what has become a repeated failure by attorneys to comply with the clear mandates of [the] Local Rules of the Northern District of New York. There simply are too many instances where attorneys take it upon themselves to either ignore or modify the Local Rules as they see fit. The Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District.

*Osier v. Broome County,* 47 F. Supp. 2d 311, 317 (N.D.N.Y. 1999).

[the Local Rule] it is unfair to its adversary, which has a right to know the factual bases of its opponent's case and the specific foundations for those assertions of fact; and its conduct is adverse to the conservation of judicial resources, which are most efficiently deployed when the parties fulfill their adversarial functions in a rigorously organized, coherent fashion." *Meaney v. CHS Acquisition Corp.*, 103 F. Supp. 2d 104, 108-09 (N.D.N.Y. Feb. 25, 2000). The Second Circuit has stated that if a non-movant is noncompliant, "FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (citations omitted); *see also Goldston v. Albany County Sheriff Dep't*, 2006 WL 2595194, at *3 n.8 (N.D.N.Y. Sept. 11, 2006) (citing *Amnesty Am. v. Town of W. Hartford*, 288 F.3d at 470); *Bennett v. Hunter*, 2006 WL 1174309, *2 n.5 (N.D.N.Y. May 1, 2006) (same).

All factual allegations must be properly supported by the record and failure to do so can lead to such consequences as deeming portions of the 7.1 Statement admitted or granting summary judgment based on the failure to comply with the Local Rules. See *Fusco v. City of Rensselaer*, 2006 WL 752794, at *2 (citing *New York Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648-49 (2d Cir. 2005) (stating that the granting of summary judgment was proper where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a)(3) Statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n.1 (2d Cir. 1998) (*per curiam*) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103

F. Supp. 2d at 108 (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations-specific or otherwise-to the record") (emphasis in original); *McKnight v. Dormitory Auth. of State of New York,* 189 F.R.D. 225, 227 (N.D.N.Y. 1999) ("deem[ing] the portions of Defendants' 7.1(a)(3) [S]tatement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F. Supp. 2d 311, 317 (N.D.N.Y. 1999) (deeming admitted all facts in defendants' Rule 7.1(a)(3) Statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record"); *see also Margan v. Niles,* 250 F. Supp. 2d 63, 67 (N.D.N.Y. 2003) (stating "Plaintiff's Rule 7.1(a)(3) [S]tatement, which contains numerous denials, does not contain a single citation to the record.  Because plaintiff's response Rule 7.1(a)(3) [S]tatement does not comply with the local rules, it has not been considered.").[14]

Here, Defendants' 7.1 Statement properly provides citations to the record to support each material fact for which there is no genuine issue.  *See* Defs.' 7.1 Statement.  Plaintiff's 7.1 Statement, however, is not fully compliant with Local Rule 7.1(a)(3).  *See* Pl.'s 7.1 Statement.   Contrary to the dictates of the Local Rules, and yet not as woefully inadequate as examples of breaches of the rule cited above in other precedent, Plaintiff fails to provide citations to the record for paragraphs numbered 33, 37, 43-46, 48, 50-54, 59, 61, 63-75, 79-80, 86, 88-92, 102-122, and 125, which required this Court to scoured the voluminous record.

Many of the Plaintiff responses were "General Objection[s]."  These do not constitute statements of fact; they are statements of testimony that should be determined by the trier of fact.  *See e.g.*, Pl.'s Statement ¶¶ 64-75.  First, these types of responses do not comply with the Local Rules'

---

[14] Defendants also cite in their Reply Brief a myriad of Northern District cases pertaining to a non-movant's failure to comply with Northern District of New York Local Rule 7.1(a)(3) to which this Court takes notice. Dkt. No. 114, Defs.' Reply Mem. of Law at pp. 3-4 n.1.

directive to agree or disagree with the movant's 7.1 Statement and if there is a disagreement, the non-movant is to set forth specific citation to the record where the factual issue arises and provide additional material facts if necessary. Making a "General Objection" is not a permitted response. Second, in those instances where Plaintiff retorts that "these are not statement of facts," Plaintiff is materially in error, since Defendants generally quoted from depositions and provided specific citations thereto. These are Defendants' assertion of facts, which require an agreement or disagreement, not just an objection of this nature. Under these circumstances and as to these paragraphs, Defendants' statements are deemed admitted, which are objectively supported by citations to the record. *See supra* n.3.

More troublesome for the Court are Plaintiff's Statements of Fact wherein Plaintiff disagrees and gives reasonable reasons though no citations. These reasons, however, are opinions not facts. We agree that in some instances a specific reference to the record is not feasible and a recitation of direct fact may not be plausible. In others, Plaintiff could have been more diligent in identifying citations. Based upon the totality of the record supported solely by the Court's effort pouring over the record, those paragraphs containing a disagreement with a reasonable explanation will not be deemed admitted. However, in those paragraphs where the Plaintiff stated that she disagrees, without further extrapolation or citation, or "disagree[s], as this assertion is unknown to the plaintiff" (e.g., ¶¶ 102-114, 121, & 122), this Court will deem the facts in Defendants' 7.1 Statement admitted.

More bewitching for the Court are Plaintiff's responses stating "disagree, as defendants Palumbo and Peters would never promote plaintiff." Pl.'s Statement ¶¶ 115-120. Again, citations are absent, and here Plaintiff is opining rather than stating a material fact. In one view, such a response is akin to those noted as "upon information and belief," which is not allowable. On the other hand, it is arguable that such a response could be considered a "good faith and reasonable belief," which is permitted in order

to determine whether a materially adverse employment action occurred.  The Court will reserve our discussion on this comment until we address the First Amendment cause of action and the issue of whether there existed a materially adverse employment action. *See infra* Part III.C.4.

## B.  Collateral Estoppel

Plaintiff claims that the doctrine of collateral estoppel is applicable to the state arbitration findings as to the causal connection requirement of Plaintiff's First Amendment claim.  Pl.'s Mem. of Law at p. 15.  Defendants assert they should not be bound by collateral estoppel as they did not have a full and fair opportunity to litigate the issue of causation since they were not parties to the arbitration and the issue of causal connection was not before the arbitrator. Defs.' Reply Mem. of Law at pp. 9-10.

Pursuant to "the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts must give state-court judgments the same preclusive effect as they would receive in courts of the same state." *Burkybile v. Bd. of Educ. Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)); *see also Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir. 1996) (citing *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 (1982)).  However, the Second Circuit has held that "neither arbitrations nor administrative adjudications are state-court judgments within the coverage of Section 1738." *Burkybile v. Bd. of Educ.*, 411 F.3d at 310 (citing *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986) & *McDonald v. City of W. Branch*, 466 U.S. 284, 287-88 (1984)).  Notwithstanding, if a party initiates a federal action under 42 U.S.C. § 1983, "state administrative fact-finding is given the same preclusive effect as it would receive in courts of the same state." *Burkybile*, 411 F.3d at 310 (citing *Univ. of Tenn. v. Elliott*, 478 U.S. at 799).

Under federal law, a party is collaterally estopped from relitigating an issue if the following

four-part test is met: "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998) (quoting *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir. 1997) (further citations omitted); *see also United States v. United States Currency in Amount of $119,984.00, More or Less*, 304 F.3d 165, 172 (2d. Cir. 2002). Stated another way, "[u]nder collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties. It follows that, '[a]s compared to claim preclusion, the rules of issue preclusion do not purport to prohibit litigation of matters that never have been argued or decided.'" *Benjamin v. Traffic Executive Ass'n E. R.Rs.*, 869 F.2d 107, 111-12 (2d Cir. 1989) (citations omitted).

In addition, collateral estoppel may bar relitigation of an issue against different defendants so long as the parties against whom the doctrine would be invoked were in privity with a party in the prior adjudication. 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 132.04(1)(b)(i) (3d ed. 2005). "The term privity signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive on the others, although those others were not party to the lawsuit." *Id*. at ¶ 132.04(1)(b)(ii); *see also Staten Island Rapid Transit Operating Auth. v. I.C.C.,* 718 F.2d 533, 543 (2d Cir. 1983) (noting that privity, in general, means "concurrent relationship to the same right of property; successive relationship to the same right of property; or representation of the interests of the same person.") (citation omitted)).

Arbitration and administrative final adjudications may have preclusive effect "even in the

absence of judicial confirmation of the award." *Clarke v. UFI, Inc.*, 98 F. Supp. 2d at 335 (citing *Benjamin v. Traffic Executive*, 869 F.2d at 111-13); *Borguslavsky v. Kaplan*, 159 F.3d at 720 ("[C]ollateral estoppel can be predicated on arbitration proceedings."); *cf. Finnegan v. Bd. of Educ. of Enlarge City Sch. Dist. of Troy*, 1993 WL 729846, at *9 (N.D.N.Y. Nov. 18, 1993) (declining to give preclusive effect to an arbitration proceeding which might impact upon a constitutional right being litigated). Thus, "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the state's courts." *Burkybile*, 411 F.3d at 312 (quoting *Univ. of Tenn.*, 478 U.S. at 799) (stating, however, that the Second Circuit did not decide whether arbitrations have preclusive effect, but instead the Court held collateral estoppel applied because the hearing was an administrative adjudication). And "New York courts [will] give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate." *Id.* at 310 (citing *Ryan v. New York Tel. Co.*, 467 N.E.2d 487 (N.Y. Ct. of App. 1984)); *Doe v. Pfrommer*, 148 F.3d 73, 79-80 (2d Cir. 1998); *Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 46 (2d Cir. 1985)).

Here, collateral estoppel clearly would not apply. The Defendants in this case did not have a full and fair opportunity to litigate the issue as they were not parties to the arbitration. The only "defendant" in the arbitration was Plaintiff's employer, the State of New York Office of Children and Family Services. Dkt. No. 109, James A. Resila, Esq., Aff., dated Apr. 7, 2006, Joint App., Ex. 12, Arbitration Decision. Though the current Defendants were not parties, if they could be considered in privity with the State of New York Office of Children and Family Services, collateral estoppel may be applicable. However, in this case, the Court does not find that any privity exists. The relationship is

not such that a judgment against the State of New York Office of Children and Family Services could be justly conclusive as to these Defendants since the Defendants were not provided with an opportunity to prepare a defense or even present their individual cases.

Moreover, this Court cannot not give preclusive effect to the arbitrator's "fact-finding" on three grounds.  First, this Court has already determined that the Defendants did not have a full and fair opportunity to litigate.  Second, the arbitrator did not issue a full record of the proceeding, or alternatively, the record provided to the Court does not reflect a complete decision, so we are unable to determine the "facts" upon which the arbitrator based his decision.  *Id.*  The "Arbitrator's Analysis" is extremely brief and the arbitrator essentially states that he rendered his decision by "examining the various documents in the record," lending the arbitration record to be wholly inadequate *Id.*  Third and finally, as far as we can determine from the meager record of the arbitration, the arbitration dealt solely with an event accruing on December 24, 1998, without any mention or regard for Plaintiff's statements to the newspaper, legislative figures, and investigative personnel occurring throughout 1998 and 1999, which support the conclusion that these Defendants did not have an opportunity to litigate the issues nor were in privity with the state agency involved.[15]  As stated above, in order for collateral estoppel to give preclusive effect to administrative agency findings, "the issue sought to be precluded [must be] identical to a material issue necessarily decided by the administrative agency in a prior proceeding." *Locurto v. Giuliani,* 447 F.3d 159, 171 (2d Cir. 2006) (citation omitted).

---

[15]  The text of the arbitrator's decision reads in relevant part as follows:

> On 12-23-99, Ms. Morrison is served with a NOD charging alleged misuse of her position on 12-24-98 . . . [.] The Labor-Management process in a free society can not tolerate an alleged 'sin' in December 1998 first brought to the attention of the employer one year later . . . [.] The State waits until November 1999 before charging Ms. Morrison with the alleged conduct.  The State procedure seeking dismissal of Ms. Morrison is not timely filed and is hereby dismissed.  On the record before me it is also without merit.

Dkt. No. 109, Ex. 12.

Therefore, based upon the foregoing reasons, collateral estoppel will not be imposed on these Defendants.

### C.  First Amendment Claim

A public employee's First Amendment rights are not stripped from her by virtue of being employed by government.  "The mere fact of government employment does not result in the evisceration of an employee's First Amendment rights." *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir. 2003) (quoting, *inter alia, Connick v. Myers,* 461 U.S. 138, 140 (1983) and citing *Lewis v. Cowen,* 165 F.3d 154, 158 (2d Cir.1999) ("It is by now well established that public employees do not check all of their First Amendment rights at the door upon accepting public employment.").  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak on matters of public concern.  *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1957 (2006).  The public employer, however, is not without rights as well to regulate the speech of its employees in order to assure "the efficiency of the public services it performs." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987) (cited in *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006); *Garcetti v. Ceballos*, _ U.S. _, 126 S.Ct. at 1958 ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.").

In order for a public employee to state a claim for retaliation under the First Amendment for exercising her right of free speech, the public employee must initially establish that:

> (1) [her] speech addressed a matter of public concern, (2) [s]he suffered an adverse employment decision, and (3) a causal connection exists between [her] speech and that adverse employment decision, so that it can be said that the speech was a motivating factor in the adverse employment action.

*Cioffi v. Averill Park*, 444 F.3d at 162 (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999));

*Feingold v. New York*, 366 F.3d 138, 160 (2d Cir. 2004).

Even false or hyperbolic speech by a public employee is protected by the First Amendment unless that false speech is made in reckless disregard of the truth. *Reuland v. Hynes*, _ F.3d _, 2006 WL 2391163, at *4 (2d Cir. Aug. 21, 2006).

Even if the public employee can establish these three elements, the public employer has three primary defenses to the claims: (1) the government employer can demonstrate that the employee's speech disrupted the workplace by showing "that its interest in promoting an efficient workplace outweighs the employee's rights and interest in commenting on matters of public concern"; (2) the government employer would have taken the adverse employment action "even in the absence of the protected conduct"; and (3) if the public employee's speech was considered a part of her official duties. *Cioffi*, 444 F.3d at 162-63 (citing, *inter alia*, *Connick v. Myers*, 461 U.S. at 151-52 quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)) & *Garcetti*, 126 S. Ct. at 1960 (finding that public employees who make statements pursuant to their official duties gain no First Amendment protection). "When a citizen enters governmental service, the citizen by necessity must accept certain limitation[s] on his or her freedom," and government employers "need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provisions of public services[, because public employees] . . . can express views that contravene governmental policies or impair the proper performance of governmental functions." *Garcetti*, 126 S. Ct. at 1958 (citing *Waters v. Churchill*, 511 U.S. 661, 671 (1994) & *Connick*, 461 U.S. at 143).[16]

---

[16] Those employees who are considered  policy makers do not have the same broad First Amendment rights when speaking publicly as other public employees. *Kaluczky v. City of White Plains*, 57 F.3d 202, 208-09 (2d Cir. 1995).  Policy makers, since they speak on behalf of their employer, suffer more limitations on their First Amendment rights.

**1.  Matter of Public Concern**

We must first address whether Morrison's conversations with officials from other state agencies and the news media were matters of public concern.

As a general proposition, speech by a public employee that relates "to matter[s] of political, social, or other concerns to the community" are deemed matters of public concern.  *Johnson v. Ganim*, 342 F.3d at 112 (citations omitted).  However, if the public employee does not speak as a citizen but rather as an employee upon a matter "only of personal interest," federal court is not the appropriate forum to address the matter.  *Connick*, 461 U.S. at 147.  It is the providence of the court, as a matter of law, to determine whether a public employee's speech by "context, form, and content" constitutes a public concern.  *Id.* at 147-48; *Reuland v. Hynes*, 2006 WL 2391163, at *5.

In rendering this determination, the court should consider the employee's motivation in making the public speech as only one factor to be considered.  *Reuland*, 2006 WL 2391163, at *5-6 & 8 (finding that the "speaker's motive [is not solely critical and] cannot be the only factor that [a court] consider[s]").

Appreciating the comprehensive sweep of what may constitute a matter of public concern, the Supreme Court and the Second Circuit have not only given us specific examples of what would be included within this rubric, but they have also drafted broad paradigms to consider when deciding whether a public employee's statement falls within the realm of public discourse.  Who is best able to speak about the operation of government than a governmental employee.  It is often government employees who are in the best position to speak about the ails of government.  *Cioffi*, 443 F.3d at 166-67 (citing *Waters v. Churchill*, 511 U.S. at 674).  "Exposing governmental inefficiency and misconduct is a matter of considerable significance" to the public.  *Garcetti*, 126 S. Ct. at 1962; *Burkybile v. Bd.*

*of Educ. of Hasting-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313 (2d Cir. 2005) ("Public accusations of improper governmental actions are clearly matters of public concern[.]").   Concerns raised about crime (*Reuland*, 2006 WL 2391163, at *8) and the lawfulness of pubic officials implicate matters of public concern (*Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006)).

Matters that are purely personal or calculated to redress personal grievances will not qualify as public concerns.  *Hoyt v. Andreucci*, 433 F.3d at 330; *Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991).  Sometimes, however, it may be difficult to delineate between purely personal statements and those that rise to the level of public concern.  There are times when an employee's statements made privately can still be considered of public concern.  *Cioffi*, 443 F.3d at 165. Even in some circumstances when the speech, which may become public, is motivated partially by personal reasons such as saving a job, it can still be protected by the First Amendment.  *Id*. at 166-67. In this respect, we are compelled to examine the content, form, and context of the public statement before conferring upon such statement the entitlement of public concern.  *See Connick*, 461 U.S. at 146; *Hoyt*, 433 F.3d at 330.  We now turn to Morrison's public statements.

The topic of her public comments to legislative staff, investigators, other state agency heads, and the media concerned corruption and fraud within SCR, predominately the abuse of overtime, intentional mishandling of calls to the SCR hotline, and office gambling.  Such discussions fall neatly within matters of political, social and other concerns, particularly the misfeasance and malfeasance of governmental agencies, and unquestionably, after reviewing the content, form, context, and forum of these public discourses, we find them to be matters of public concern. Although we do not detect from the record that Morrison harbored a personal motive for making public the dubious operations at SCR for personal gain at work, if she did, however, it would not defeat our finding.  Complementing our

finding that Morrison's statements were of public concern, is the press' interest in the content and context of the statements.  Once the media was apprised of these complaints an editorial assailing SCR was published on August 5, 1999, bringing to the public's attention the purported quagmire at SCR. Media coverage may be a principal factor to weigh in determining whether public speech was a matter of public concern, and in this case it was critical linchpin.  *Cioffi*, 444 F.3d at 165 (2d Cir. 2006) (citation omitted).

Our analysis of Morrison's statements considers any personal motivation *de minimis* and we rely solely upon the content for our ruling.  Accordingly, we find Morrison's public statements to be matters of public concern as a matter of law.  Yet, our analysis of whether Morrison's employer is liable for retaliation does not rest here.  *See* Part III.C.4 (the *Pickering-Connick* Balancing Test); *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County*, 391 U.S. 563 (1968); *Connick*, 461 U.S. 138.

## 2.  Materially Adverse Employment Action

We next must determine whether there is a genuine issue of fact on whether Morrison experienced a materially adverse employment action.

There are "no bright-line rules for determining whether an employee has suffered an adverse employment action; accordingly, the Court must pore over each case to determine whether the challenged employment action reaches the level of [materially] adverse."  *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 83 (E.D.N.Y. 2002) (citing *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)).

An adverse employment action is "a materially adverse change in the terms and conditions of employment."  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations omitted).  To constitute being materially adverse, the change in employment conditions "must be more

disruptive than a mere inconvenience or an alteration of job responsibilities." *Weeks v. New York State Div. of Parole*, 273 F.3d 76, 85 (2d Cir. 2001) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d at 640). Typical adverse employment actions are economic injuries such as dismissal, suspension, failure to promote, or diminution in pay. *Kaluczky v. City of White Plains,* 57 F.3d at 208; *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d at 84-85. However, there are lesser actions which may also be considered adverse. *Morris v. Lindau,* 196 F.3d at 110 (citing *Bernheim v. Litt,* 79 F.3d 318, 324-27 (2d Cir. 1996), which lists negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities as adverse employment actions). In fact a combination of minor offenses over an extended period of time can provide the materially adverse employment action. *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002). Whether an undesirable employment action may qualify as being adverse is "a heavily fact-specific, contextual determination." *Hoyt*, 433 F.3d at 328 (citation omitted).

A decision not to promote an employee to an available position may constitute an adverse action. *Carmellino v. Dist. 20 of New York City Dep't of Educ.*, 2006 WL 2583019, at *3 (S.D.N.Y. Sept. 3, 2006) (citing *Terry v. Aschroft*, 336 F.3d 128, 139 (2d Cir. 2003)). So too is harm to a plaintiff's reputation, opportunities for advancement, and earning potential. *Bernheim v. Litt*, 79 F.3d at 325. The same would be true if a reassignment in actuality was a demotion, downward shift in duties and responsibilities, or a set back to an employee's career. *Galabya*, 202 F.3d at 641; *Garber v. New York City Police Dep't*, 1998 WL 514222 (2d Cir. June 12, 1998). And yet a "plaintiff's subjective perception that a demotion has occurred is not enough." *Garber v. New York City Police Dep't*, 1998

WL 514222, at *3 (quoting *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996)).

As noted above, "[r]elatively insubstantial changes in an employee's work conditions do not qualify as adverse employment actions." *Jenkins v. Fisher*, 2002 WL 205674, at *6 (S.D.N.Y. Feb. 8, 2002) (citing *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997)).  For example, a negative performance evaluation, without more, does not ordinarily constitute an adverse employment action. *Weeks v. New York State Div. of Parole,* 273 F.3d at 86. Neither is criticism nor a reprimand that may embarrass the employee muster the claim of being adverse. *Fusco v. City of Rensselaer*, 2006 WL 752794, at *5 (N.D.N.Y. Mar. 22, 2006); *Jenkins v. Fischer*, 2002 WL 205674, at * 6 (standing for the proposition that "inchoate matters such as a plaintiff's embarrassment or anxiety" generally do not qualify as a 'materially adverse' change in employment") (citation omitted).  Similarly, a filing of a disciplinary action without a final adjudication would not establish an adverse employment action either. *Yerdon v. Henry*, 91 F.3d 370, 378 (2d Cir. 1996).  And the same is true for mere employee grievances.  *Hoyt*, 433 F.3d at 330.

In the final analysis, however, if an employment action is "one that would deter a similarly situated individual of ordinary fitness from exercising his or her constitutional rights, then it is adverse." *Burkybile v. Bd. of Educ.*, 411 F.3d at 313 (citation omitted).

Turning to this case, and as we pore over the extensive facts and the events, we find that a reasonable fact-finder could reasonably determine that a materially adverse employment action was pursued.  Even though Morrison was successful in defending the disciplinary action brought against her and recovered all of her accrued pay and benefits, nonetheless, by virtue of enduring such an employment action with an arbitration hearing extending over a six-month duration, knowing that she was encountering termination from her job, could conceivably be considered a materially adverse

employment action.  It is a reasonable presumption that a jury could find the events of the Notice of Discipline and the disciplinary hearing were more than a reprimand, and it is reasonable to find that a person of ordinary fitness confronted with the same circumstances while exercising her constitutional rights could possibly be deterred and adversely effected.  *Id.*

In her Complaint, Morrison seeks compensatory damages for mental anguish and emotional distress.  Dkt. No. 28, Second Am. Compl. at ¶¶ 28, 31, & Wherefore Clause.  Ostensibly, Morrison is asserting that the disciplinary process was such an ordeal that the mental anguish and emotional distress she endured was a materially adverse employment consequence.  Apparently, Morrison was treated by a psychologist, Dr. Lee Nagel, for mental anguish and pain.  Morrison Dep. at p. 72, lines 10-18.  Weighing carefully the instruction from the Second Circuit as to the degree of suffering necessary to claim that these damages create a materially adverse employment action, we find that this too creates a genuine issue of fact.  Mere embarrassment and anxiety are insufficient as a matter of law to constitute an adverse employment action, *see Jenkins*, 2002 WL 205674, at *6, and yet, harm to a person's reputation, public humiliation, and mental anguish can be the basis for compensatory damages and deemed a consequence of an adverse employment activity, *see Bernheim*, 79 F.3d at 325-26.   The degree to which Morrison sustained emotional distress presents an issue of fact.

We agree with Defendants that the counseling memoranda and the purportedly negative performance evaluations, standing alone, would not measure up to an adverse employment action.  However,  these minor offenses coupled with the other complaints, which extended over a period of time, can cumulatively constitute the materially adverse employment action.  *Phillips v. Bowen*, 278 F.3d at 103.  Therefore, all of the events and circumstances as stated above, considering the temporal relationship with the disclosure of Morrison's exercise of her First Amendment rights, present a

question of fact as to the issue of adverse employment action.

Lastly, it is settled law that a decision not to promote an employee to an available position may constitute an adverse employment action. *See Terry v. Aschroft*, 336 F.3d at 139. Morrison claims that she was denied a provisional promotion as a CPS II. We presume that there are employment advantages in holding this higher level position such as an increase in salary and supervisory responsibilities. Morrison asserts, though no specific facts were provided, that she was more qualified than her co-worker who received a provisional promotion. Conversely, Defendants proffered that even if she received a provisional promotion she would not gain a permanent appointment and would eventually have to return to her CPS I position because she was not reachable on the competitive list for CPS IIs; thus, her tenure in such a position would be ephemeral.[17] They further argued that she never applied for a provisional position at the time her co-worker was appointed as a CPS II, and yet the record indicates that Morrison was considered by the committee on at least four occasions for such an appointment. Still, it is reasonable to believe that a fact-finder could find that the temporary, provisional appointment may be a promotion, albeit short-lived.

Notwithstanding the presence of a committee in the selection process, and although not the strongest presentation of an issue of fact, a jury could further find, when considered in combination with the other claims of adverse employment action, that Morrison may have been improperly denied such

---

[17] After successfully taking an examination for a competitive job, a person becomes reachable on the competitive job list when he or she is among the top three persons on the list willing to accept the position. *See supra* p. 10. Once appointed from this list, a person is considered permanent, and after successfully completing a probationary period, he or she can only be removed from that position by a finding of cause or disability. Denise Matrazzo, Decl., dated Feb. 21, 2006, at ¶ 8. However, a permanent appointment to CPS II had another process. In order to gain a permanent appointment to CPS II and CPS III positions, an employee is granted a promotion examination only after they meet certain criteria such as a minimum time employed as CPS I. *Id*. at ¶ 9. The 1996 Promotion list for CPS IIs became non-viable in 2000 and when the new list was issued by the Department of Civil Service in 2002, Morrison's name did not appear. *See supra* pp. 10-11. Therefore, Morrison could not be granted a permanent appointment as long as the list remains viable. *Id*. at ¶¶ 10-14.

a provisional appointment because of undue influence or interference by one or more of the Defendants. Our reference to the tenuousness of the Morrison facts rests upon her statement that "Defendants Palumbo and Peters would never promote Plaintiff." Pl.'s 7.1 Statement ¶¶ 115-121.  Standing alone, said statement appears to be an opinion, a belief.  We are confronted with a juxtaposition.  We accept as a principle of law that "a plaintiff's subjective perception that a [promotion] has [not] occurred is not enough" to present a material issue of fact. *Garber*, 1998 WL 514222, at *3.  However, this principle of law is counterbalanced by another maxim of law that an employee "need not establish that the conduct she opposed - [here the denial of the provisional appointment] - was in fact a violation . . . but rather, only that [s]he had a good faith, reasonable belief, that the underlying employment practice was unlawful." *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996).[18]   At this juncture of the litigation, Morrison's belief that certain Defendants may have stymied any promotion because of her public speech, coupled with the other complaints listed above, leads this matter for a jury's consideration.

Based upon the affidavits, depositions, and other documentary evidence submitted to the Court, we cannot say, as a matter of law, that there are no material adverse employment decisions.  Rather, we find that there are enough facts to create a genuine issue of material fact for trial.  Nevertheless, finding that there are material adverse employment actions does not complete our analysis.  There could be other reasons for the material adverse employment actions which are perfectly legal.  In this regard, these possible material adverse employment actions must be subject to the *Pickering-Connick* Balancing

---

[18]  This Court does appreciate that the Second Circuit made this ruling in a Title VII case and was addressing sexual comments made by co-employees, but we do not see this principle of law to be case specific.  Since First Amendment retaliation case law has generally and often relied upon precedents from Title VII cases, it is reasonable for us to extrapolate that the above principle of law is applicable in this case as well.

Test. *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County*, 391 U.S. 563 (1968);

*Connick v. Myers*, 461 U.S. 138 (1983).  *See infra* Part III.C.4.

### 3.  Casual Connection

Next, we must determine whether a casual connection between Morrison's exercise of her First

Amendment rights and the adverse employment action exists.

To establish a casual connection, a plaintiff must show that the protected speech "was a

substantial motivating factor in the adverse employment action." *Reuland v. Hynes*, 2006 WL 2391163,

at *5 (2d Cir. Aug. 21, 2006);  *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (cited in *Cioffi v.*

*Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167-168 (2d Cir. 2006)).[19]  The casual

connection can be established indirectly with circumstantial evidence by showing that the protected

activity was closely followed by the adverse action.  *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d at

1178 (citation omitted); *Morris v. Lindau*, 196 F.3d at 110 (citing *Sumner v. United States Postal Serv.*,

899 F.2d 203, 209 (2d Cir. 1990).  Much like the element of adverse employment action, there is no

bright-line rule for casual connection.  *Richardson v. New York State Dep't Corr. Serv.*, 180 F.3d 426,

446 (2d Cir. 1999).  The courts have not "define[d] the outer limits beyond which a temporal

relationship is too attenuated to establish the casual  relationship . . . [.]" *Gorman-Bakos v. Cornell*

*Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) (also surveying cases that

have determined what duration may support a finding of casual connection).  Thus, a court will have

to closely examine the facts of each case to determine the relative temporal relationship between the

protected speech and the employment action.  *Richardson v. New York Dep't of Corr. Serv.*, 180 F.3d

---

[19]  The United States Supreme Court has stated that a substantial factor is essentially the motivating factor.  *Mt.
Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

at 446 (citing *Wanamaker v. Columbian Rope Co.*, 108 F.3d 262, 466 (2d Cir. 1997)).  Our own survey of cases indicate, depending upon the facts of the case, a period of less than ten days to a period of eight months may satisfy the element of casual connection.  *See Tiffany v. KDF Co., LLC*, 2005 WL 2739137, at *8-9 (N.D.N.Y. Oct. 24, 2005) (surveying the cases and finding a range between twelve (12) days and eight (8) months as being temporal).[20]

On August 5, 1999, an editorial appeared in the Schenectady Gazette about abuses at SCR.  Consequently, the administration and staff were upset by the public revelations of time abuse, omission of responsibilities, and the corresponding public revilement.  Some employees suspected Morrison as the purveyor of these complaints; others doubted the veracity of such speculation.  Almost concurrently, however, in October 1999, Morrison's immediate supervisor, Lehner, shared with her supervisor her fears of retribution from Morrison and  Morrison's "family related" 1998 LER which was forward to the New York State Police.  This information had been previously relayed by Lehner to her immediate supervisor, Richard Piche, back in February 1999, but no action was taken by Piche at that time.  In turn this information concerning the LER issue was shared with other managers and an investigation ensued in October 1999.  Four months after the publication, and three months after the completion of the investigation, Morrison was served with a Notice of Discipline, placed on administrative leave, and thereafter, for six months, defended a disciplinary action commenced against her.  On the facts presented in the record, it is quite plausible that a reasonable fact-finder could find that the lapse of four months after the editorial and the filing of a Notice of Discipline is temporal enough to support the

---

[20]  We further cite the following cases as a part of our survey of the relative period reckoned to be a temporal relationship between the protected activity and the adverse employment action: *Cifra v. General Electric Co.*, 252 F.3d 205 (2d Cir. 2001) (20 days); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759 (2d Cir. 1998) (10 days); *Reed v. A.W. Lawrence 7 Co., Inc.*, 95 F.3d 1170 (2d Cir. 1996) (12 days).

allegation of a casual connection between the protected act and the adverse employment action, and further find that the speech, rather than the LER alone, was a substantial motivating factor for the disciplinary action.  There is a genuine contest between the parties as to the casual connection, which invariably suggests that there is a question of fact.  However, the issue of casual connection, like adverse employment action, is subject to the *Pickering-Connick* Test.

### 4.  *Pickering-Connick* **Test**

Having already determined that Morrison had a First Amendment right to speak to investigators, legislative aids, and the press about misfeasance and malfeasance at SCR, *see supra* Part III.B.1, we must then ask did the government-employer have a legal justification to pursue an adverse employment action against Morrison in any event.  We note that public employers need a significant degree of control over their employees' actions and words for a host of reasons.  Public employees "do not enjoy free reign to speak out without regard to the interests of their public employer." *Cioffi v. Averill Park*, 44 F.3d at 162 (citing *Bernheim v. Litt*, 79 F.3d 318, 324 (2d Cir. 1996)).  To balance a citizen-employee's freedom of speech with the government-employer's right to efficiently govern their employees is not an easy inquiry considering the "enormous variety of facts and situations." *Garcetti v. Ceballos*, 126 S. Ct 1951, 1958 (2006) (citation omitted).  Previously, we identified at least three defenses to a claim of First Amendment retaliation.  *See supra* III.C. at p. 22.  Briefly, the government employer can demonstrate that the employee's speech disrupted the workplace, the government employer would have taken the adverse employment action anyway, and the public employee's speech was considered a part of her official duties. *Cioffi v. Averill Park*, 444 F.3d at 162-63 (citing, *inter alia*, *Connick v. Myers*, 461 U.S. at 151-52 & *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *Garcetti v. Ceballos*, 126 S. Ct. at 1960.  Such defenses must be shown by a

preponderance of the evidence. *Morris v. Lindau*, 196 F.3d at 110.

We can dispatch two of the defenses relatively quickly because they were not raised by Defendants.  First, there is no allegation that Morrison was making these public statements as a part of her official duties.  Second, Defendants are not claiming that her statements to other agencies and the media disrupted the workplace, although the disclosure of the charges of fraud and possible criminality at SCR did cause quite a stir.  Defendants instead rely upon the defense that they would have taken the disciplinary action even in the absence of Morrison's protected speech.

The Strock editorial notwithstanding, Defendants strenuously argue they have clearly demonstrated that Morrison's breach of SCR protocol by filing the LER, without supervisory approval, was so egregious that they would have taken the same action.  Once it was revealed that Morrison used her position at SCR to initiate an action on behalf of her family, the complaint reverberated throughout the management pecking order.  After much consultation, the need for an investigation was ordered by Defendant Bartley.  Eventually a Notice of Discipline was served upon Morrison even though the Governor's office asked SCR to withdraw the charging instrument.  Morrison was placed on administrative leave with pay and an arbitration hearing ensued.

Defendants argue that there is only one reasonable inference to be drawn; that is Defendants would have taken the same action against Morrison even in the absence of the alleged improper motive. The inference is logical and persuasive.  Yet, as strongly articulated and presented by Defendants, we cannot agree that it is the **only** reasonable inference of the events.  The crux of this defense turns on whether Defendants had knowledge of Morrison's First Amendment forays prior to serving her with the Notice of Discipline and placing her on administrative leave.  Defendants assert that they did not have first hand knowledge.  Morrison contends that Defendants and colleagues suspected her all along

as the person who leaked these allegations to the press and hold that they determined immediately after the Strock editorial that she had shared the information with the media.  Knowing when Defendants actually knew that Morrison had indeed provided the information or that she was high on the list of potential informants is a critical issue of fact in determining whether this protected activity was a substantial motivating factor in commencing a materially adverse employment action.  Knowing when Defendants knew of Morrison's breach of SCR protocol and deciding to take action against her is pivotal as well.  In deciding motions for summary judgment, the Court must refrain from making judgments on credibility and that is what this Court is confronted with; deposition testimony by Defendants Peters and Smith seems to suggest that they knew or highly suspected that Morrison was the source of the information.  This is enough to generate a genuine issue of material fact as to whether Defendants might have been motivated by Morrison's exercise of her First Amendment rights in filing the Notice of Discipline or failing to consider her for promotion to the temporary, provisional promotions.

### D.  Personal Involvement

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4)

was grossly negligent in managing subordinates who caused the unlawful condition or event.[21] *Back v. Hastings-on-Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986). The mere holding of a high position of authority does not transcribe into untransmutable liability. *Back v. Hastings-on-Hudson Union Free Sch. Dist.*, 365 F.3d at 127 (citing *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1998)). Pointedly, "mere 'linkage in the [] chain of command' is insufficient to implicate a state commissioner . . . in a § 1983 claim." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (defendant may not be held liable simply because he holds a high position of authority). There must be direct intended participation by a person with knowledge of the facts. *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) (citing *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)).

A review of the record indicates that there is a question of fact as to each Defendants' participation in the alleged retaliatory action except one, Commissioner John Johnson. As discussed above, evidence has been presented that there is a question of fact as to the knowledge of the Defendants regarding Morrison's exercising her First Amendment rights and their involvement in some stage of the alleged materially adverse employment action, but Johnson. A contest exists as to whether these Defendants had a role somewhere in the chain of events; that is, they either had knowledge that Morrison was the source of the Strock article and contributed to the action against her, participated in

---

[21] Relevant factors to be considered in this determination are whether the supervisory defendant had actual knowledge of a constitutional violation; whether he approved or reviewed the complained of action; whether he had authority over or supervised such action; whether he enacted a relevant policy; whether he provided instruction or training to personally involved defendants; length of time in supervisory position; and whether corrective measures were within the power of the defendant at the time. *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986); *Langley v. Coughlin*, 715 F. Supp. 522, 545-49 (S.D.N.Y. 1989).

management meetings where a decision was made to pursue a disciplinary action against her, or decided that she should not get a provisional appointment based, in part, on her disclosures to the public.

But Morrison has not presented any proof that Johnson had direct involvement in any of the alleged actions taken against her. Morrison surmises that Johnson may have seen a letter spreading rumors that she was the anonymous source of the Strock article. She also contends that she sent emails to Johnson indicating harassment by supervisors. She assumes that he had intimate knowledge of the details about the Notice of Discipline served upon her and her other adverse employment events, but knowledge alone is insufficient to establish any of the elements of personal involvement. The fact that Plaintiff may have written a letter or emails does not automatically render the supervisory official responsible for any constitutional violation. *See Thomas v. Coombe*, 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998) (ignoring letter is insufficient for personal involvement); *Young v. Kihl*, 720 F. Supp. 22, 23 (W.D.N.Y. 1989) (the wrong must have been capable of mitigation at the time the supervisory official was apprised thereof); *Woods v. Goord*, 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998) (receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Supervisors cannot be deemed personally involved based simply on a response or a lack of response to a complaint. *See Sealey v. Giltner*, 116 F.3d at 51. There is no proof that Johnson was aware of the events surrounding Morrison or that he was grossly negligent in supervising those who may have been responsible for violations of her rights. In this respect, there is no genuine issue of material fact regarding Defendant Johnson's involvement in the alleged violation of Morrison's constitutional rights.

### IV.  CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that the Motion for Summary Judgment (Dkt. No. 105) is **Denied** in part and

**Granted** in part; and it is further

ORDERED, that the Amended Complaint is Dismissed against Defendant Johnson; and it is further;

ORDERED, that the parties notify this Court by filing a letter electronically, indicating the dates and times they are available to participate in a telephonic conference during the week October 9, 2006; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Order on all parties by regular mail.

IT IS SO ORDERED.

Date:   September 28, 2006
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge

-38-